

**IT IS ORDERED as set forth below:**

**Date: November 26, 2019**

_____

**Barbara Ellis-Monro
U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

IN RE:

Aspen Village at Lost Mountain Memory Care, LLC,

    Debtor.

CASE NO. 19-40263-BEM

CHAPTER 11

### ORDER ON CONFIRMATION OF DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION DATED SEPTEMBER 13, 2019

   This case came before the Court for a hearing (the "Hearing") on September 19, 2019 on confirmation of chapter 11 plans filed by Aspen Village at Lost Mountain Assisted Living, LLC ("Assisted Living") and Aspen Village at Lost Mountain Memory Care, LLC ("Debtor" or "Memory Care") (collectively, the "Debtors"). Confirmation was opposed by Debtors' secured creditor, MidCap Funding Investment IV, LLC ("MidCap"). At the Hearing, Joyce Pearson, Thomas Tropea, and Gregory Hays testified, Debtors' exhibits 42 through 46 were admitted [1] into evidence, and counsel presented closing arguments. After carefully

---

[1] Additional documents had been admitted at a prior evidentiary hearing and were considered by the Court. *See* page 5, *infra.*

considering all of the evidence presented at the Hearing and at the prior evidentiary hearings in this case, the arguments and briefs of the parties and the entire record of both cases, the Court now enters its findings of fact and conclusions of law as provided by Fed. R. Bankr. 7052 as applied by Fed. R. Bankr. P. 9014.

## I.   **FACTS**

Debtor is a Georgia corporation that owns a mostly completed building and the 5.8 acres of real property on which it sits. The property is situated across the street from an assisted living facility (the "Assisted Living Facility") owned by Assisted Living. The building is designed to be a memory care facility with a capacity of 48 residents upon completion (the "Memory Care Facility"). Although it sat vacant for some time the Court found that as of January of 2019, the Memory Care Facility had a completed building envelope, fencing, locked doors, grading and landscaping and that most of its windows were in good condition. The Court further found that completion of construction at the Memory Care Facility should take approximately four months from the time it is fully re-started.

Debtor is owned by Robert Fouse ("Fouse") and Anderson Glover ("Glover"), 45% and 55%, respectively. It has no employees. As proposed, the Memory Care Facility would, like the existent Assisted Living Facility, be a "Class A" facility of above average quality.[2]

Assisted Living and Memory Care are designed to operate as a "campus". Fouse was engaged as an architect in July of 2008 to help create and execute a master plan for a 32-acre site, which would have been a three-part campus including active adult, assisted living, and memory care housing. The land for the Memory Care Facility was procured at the end of 2014. The active adult land was sold at a foreclosure auction some time in 2018.

---

[2] The Court notes the testimony of MidCap's construction expert, David Daniel, at the MFR Hearing might oppose this characterization. However, his testimony was directly refuted by more persuasive testimony from Joyce Pearson and Thomas Tropea, who have both visited the Facility more recently than Mr. Daniel.

On February 5, 2016, Debtors obtained a loan from MidCap (the "Loan") to refinance a preexisting Department of Housing and Urban Development loan and to pay some other outstanding debt. The Loan is secured by a first priority security interest in the real and personal property of the Debtors. As part of the loan transaction, Debtors and MidCap entered into a credit and security agreement, which has been modified several times (as modified, the "Credit Agreement"). [*See* MidCap's exhs. 21-23]. The original principal amount of the Loan was $18.05 million, which included a $4.4 million construction draw for development of the Memory Care Facility. For the first 18 months, only interest payments were due on the Loan. The first principal and interest payment was due in May of 2018; it has not been made.

Site work at the Memory Care Facility began in September of 2016 and construction began in either January or February of 2017. Construction slowed down beginning in November of 2017. At some point after that, the actual percentage completion of the building was less than the amount of work for which the general contractor had been paid, and MidCap declined to fund additional construction payments. The MidCap Loan became "out of balance," a term of art that means the cost to complete the building was greater than the remaining amount of the construction holdback. After MidCap's construction consultants, EMG, recommended $0 funding in February of 2018, MidCap funded approximately $20,000, somewhat less than the general contractor requested, and exercised its right to do a cost to complete report on the Memory Care Facility.

By March of 2018, MidCap had ceased funding the Loan and sent Debtor a notice of default for failing to pay an administrative fee, for liens against the Memory Care property and for failing to meet construction milestones. Construction of the Memory Care Facility halted completely by May of 2018. Because the Loan was out of balance, construction was not

complete and Debtor had not paid the principal and interest payment due on May 1, MidCap

notified Debtors of these additional defaults in May and again in June of 2018 with respect to the

failure to make the June principal and interest payments as well as the prior defaults noted.

[MidCap's exh. 25]. Thereafter, MidCap notified Debtors that it would advertise a foreclosure of

both Facilities in October 2018, November 2018, and January 2019. [MidCap's exh. 26].

## II.    BACKGROUND AND PROCEDURAL HISTORY

This case was filed under chapter 11 on February 5, 2019. [Doc. 1] [3].  On March

1, 2019, a hearing (the "Ombudsman Hearing") was held on the necessity of the appointment of

a patient care ombudsman in Assisted Living[4] on its motion to excuse the appointment of such

ombudsman [19-40262, Docs. 41, 47]. Dr. David Lovell testified at the Ombudsman Hearing.

The Court granted the motion to excuse the appointment later that same day. [19-40262, Doc.

53].

An evidentiary hearing was held on MidCap's stay relief motions on April 18,

2019 and May 13, 2019 (the "MFR Hearing"). [Docs. 13 and 24]. William Ray Childs, David

Daniel, Robert Fouse, Michael Fleck, Anthony Williams and Joyce Pearson testified and

Debtor's exhibits 1-12, 14-23, 25-30, 33-41 and MidCap's exhibits 5, 6a, 7-24, 26, and 29 were

admitted into evidence. In denying MidCap's motion for stay relief, the Court found that the

value of Assisted Living's real and personal property was $15.8 million, and the value of

Memory Care's real and personal property was $4.6 million for a total of $20.4 million. [19-

40262, Doc 76 ¶ 4.6].

---

[3] All citations to docket entries refer to Memory Care, case 19-40263, unless otherwise specified.

[4] No ombudsman was necessary for Memory Care, as the facility is not operational and has no residents.

Debtor's first plan of reorganization was filed April 15, 2019. [Doc. 42]. MidCap filed its ballot rejecting the plan on August 12, 2019. [Doc. 69]. MidCap filed is *Objection[s] to Confirmation of Chapter 11 Plan* [Doc. 85] on August 30, 2019. Robert Fouse filed an objection to confirmation on September 9, 2019, [Docs. 92, 93] but this objection was resolved with a third amendment to the plans, filed September 13, 2019. [Doc. 94] (the "Plan").

## III.   <u>THE PLAN</u>

In the Plan, Debtor proposes to pay all creditors in full through a combination of monthly payments and the sale, refinancing or recapitalization of Debtor upon the earlier to occur of the closing of the sale or refinancing of Debtor's obligations or in "the 36th full month following the Effective Date." More specifically, the Plan provides that the Effective Date will occur 60 days after entry of the order on confirmation such that the balloon payments would be due no later than 38 months from entry of an order confirming the Plan. The Plan further provides that Paulding County's claim of $23,000 will be paid monthly and in full five years from the filing date. Secured claims, other than MidCap's claim (for example, materialmen's liens) and general unsecured claims will be paid interest semi-annually with the balance of the claims paid upon execution of Debtor's exit strategy.

MidCap asserts that, as of February 20, 2019, it is owed $19,271,908.39 on the Loan, consisting of (i) principal in the amount of $16,856,257.71, (ii) unpaid standard accrued interest in the amount of $1,192,360.86, (iii) unpaid default interest of $739,057.47, (iv) an exit fee of $180,500.00; (v) unpaid late charges in the amount of $107,631.64, (vi) other costs of $18,834.49, (vii) Second Amendment Fee of $50,000.00, (viii) Third Amendment Fee of $50,000.00, (ix) outside counsel fees of $38,524.52, (x) internal counsel fees of $7,700.00, and

stub interest between February 1-5, 2019 of $31,041.70, with interest accruing after February 5, 2019 at the per diem rate of $6,208.34.[5]

The Plan provides that Debtor will pay MidCap's claim as follows:

a.  $20,000 monthly for the first six months following the Effective Date;

b.  $25,000 monthly for months seven through 14;

c.  $50,000 monthly for months 15 through 18;

d.  $70,000 monthly for months 19 through 24;

e.  $100,000 monthly for months 25 through 35; and

f.  the balance paid in full in the 36th month following the Effective Date.

Interest will accrue on the principal balance of MidCap's claim at the rate of 7.5% annually and MidCap will retain its lien and security interest to the same priority and validity as existed on the filing date. The Plan further provides that upon sale of or refinancing of the obligations secured by Debtor's property that MidCap will release its lien upon payment of its allowed secured claim in accordance with the sale procedures contained in the Plan.

The Plan provides for Debtor's members, Glover and Fouse, to retain their respective interests in the Debtor; provided that, Debtor is authorized to issue additional membership interest units in Debtor post-confirmation. Any such issuance will reduce Glover's and Fouse's membership interests and therefore ownership interests pro-rata.

The Plan contemplates an infusion of capital to complete construction of the Memory Care Facility. Investors EEI Fund, the Raiden Group, LLC, and PMG LLC executed a letter of intent on September 11, 2019, proposing an infusion of $2,500,000 of cash into the Debtors in exchange for at least 90% equity, with the transaction scheduled to close 60 days after confirmation of the Plans (the "LOI"). [D.'s exh. 42]. Mr. Tropea testified that $2,000,000 was

---

[5] Debtor disputes these amounts in the Plan. [Doc. 42 at 15].

for construction with the additional $500,000 available as working capital or a financial backstop.

With the exception of MidCap, all creditors who voted voted in favor of the Plan. MidCap also objected to confirmation on the following basis:

- The Plan is not feasible in violation of 11 U.S.C. § 1129(a)(11) because the projections upon which the Plan is based are not reliable and because the proposed funding source for the construction of the Memory Care Facility is insufficiently certain.

- The Plan violates § 1129(a)(7) because a true liquidation analysis has not been performed.

- The Plan was not proposed in good faith as required by § 1129(a)(3) because the Plan is a scheme to frustrate MidCap's foreclosure rights.

- The Plan treats MidCap unfairly and inequitably in violation of § 1129(b) by cramming down MidCap's interest rate and by negatively amortizing such that MidCap must wait three years for full payment of the interest accruing during the term of the Plan.

## IV.    ANALYSIS

To determine whether a plan is confirmable, the Court must consider all sixteen requirements set forth in 11 U.S.C. § 1129(a) and, if all are met except subsection (a)(8), not all impaired classes of creditors vote to accept the plan, then § 1129(b) provides that the plan may still be confirmed as long as it does not discriminate unfairly and is fair and equitable. *In re 431 W. Ponce de Leon, LLC et al.*, 515 B.R. 660, 669 (Bankr. N.D. Ga. Aug. 11, 2014). The plan proponent bears the burden of evidence and persuasion for each element of § 1129. *Id.*

**A.      Confirmation Requirements of § 1129(a) at Issue**

The Court finds that the requirements of 11 U.S.C. §§ 1129(a)(1), (2), (4), (5), (9), (10), and (12) have been met and 11 U.S.C. §§ 1129(a)(6), (13), (14), and (15) are not relevant to this case. The remaining requirements of section 1129(a) are analyzed below.

1.      Feasibility - § 1129(a)(11)

Section 1129(a)(11) states that for a plan to be confirmed, it must be feasible in that, "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." The evidentiary standard for feasibility is a preponderance of the evidence. *Bank of the West v. Wiersma (In re Wiersma)*, 227 Fed. App'x 603, 605 (9th Cir. 2007) (cited with approval in *In re Diplomat Constr., Inc.*, No. 09-68613, 02009 WL 6498180 at *2 (Bankr. N.D. Ga. 2009) (Diehl, J.)); *see also Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997) (same).

> The use of the word, likely, requires the Court to assess whether the plan offers a reasonable "probability of success, rather than a mere possibility." While § 1129(a)(11) does not require the debtor to guarantee success, establishing feasibility requires more than a promise, hope, or unsubstantiated prospect of success. *See, e.g., In re Wiersma*, 277 Fed. App'x at 606; *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 801 . . . The purpose of the feasibility requirement . . . is to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation. A determination of feasibility must be "firmly rooted in predictions based on objective fact."

*In re Diplomat Constr., Inc.*, 2009 WL 6498180 at *2 (some internal citations omitted); *see In re Wiersma*, 227 Fed. App'x at 605 ("The proponents of a Chapter 11 plan must show that the plan 'has a reasonable probability of success' and is more than a 'visionary scheme.' However, 'the

8

prospect of financial uncertainty does not defeat plan confirmation . . . since a guarantee of the future is not required. The mere potential for failure of the plan is insufficient to disprove feasibility.'") (internal citations omitted).

"Factors to be considered when judging the feasibility of the plan include the earning power of the business, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company." *In re Thurmon*, 87 B.R. 190, 191 (Bankr. M.D. Fla. 1988) (denying confirmation where debtor's buyer had not yet applied for financing and when arrangements had been made with a contractor for only a portion of the necessary development) (citing *In re Clarkson*, 767 F.2d 417 (8th Cir. 1985)).

> **a.   The letter of intent is not too speculative to provide a sufficient capital structure for the construction of the Memory Care Facility.**

"When a plan depends on post-petition financing . . . it is not possible to satisfy the feasibility requirement in section 1129 without 'evidence of a firm commitment of financing.'" *In re Aurora Memory Care, LLC*, 589 B.R. 631, 642 (Bankr. N.D. Ill. 2018); *see also In re Ralph C. Tyler, P.E., P.S., Inc.*, 156 B.R. 995, 996 (Bankr. N.D. Ohio 1993) (plan funding was preference actions that were untenable and outside funding that had not been identified) ("Without evidence of a firm commitment of financing, th[e p]lan does not meet the feasibility requirement.").

A letter of intent, even a non-binding one that is subject to some contingency, can be supportive of a finding of feasibility. *See, e.g., In re DLH Master Land Holding, LLC*, No. 10-30561-HDH-11, 2011 WL 5883881 at *13 (Bankr. N.D. Tex. Nov. 23, 2011). But such letters are not alone sufficient; for example, where financial projections showed negative cash flow for

the first two years after confirmation only turning to profit in the third year, a bankruptcy court denied confirmation on feasibility grounds, even though the debtor showed three pre-petition letters of intent to purchase its property, all of which had failed to result in a sale. *In re Investors Fla. Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 765-66 (Bankr. N.D. Fla. 1994); *see also Aurora Memory Care*, 589 B.R. at 642 (converting case to chapter 7 where no plan had been proposed and letter of intent was for "discussion purposes only and does not constitute an offer, agreement, or commitment to lend.")

The LOI states that it is "binding" and permits only a 15-day due diligence period. MidCap argued at the Hearing that language in the LOI such as "would move forward with this investment" and "intention to negotiate the remaining material terms" [D.'s exh. 42] made the letter too speculative to be a feasible funding source. However, the testimony of Mr. Tropea was that few contingencies could appear that would prevent the deal from closing, and that it was his intention and the intention of those investors for whom he acts as an agent to provide the financing.  On cross examination Mr. Tropea did acknowledge that it was possible that the funding would not occur but he stated emphatically that if the Plan terms did not change it was the intention of all parties to fund the transaction. Mr. Tropea testified further that quite a bit of due diligence has already been completed including 10 site visits and evaluation by general and subcontractors. In addition, Mr. Tropea and the investors proposing the letter have several specific plans for management or disposition of the Debtors' property including preleases at Memory Care, a sale of either or both facilities, or the infusion of further new capital into either or both Debtors. Thus, the Court finds that the LOI is supportive of feasibility.

b.    **Debtor's revenue and occupancy projections reflect sufficient earning potential.**

"Th[e] determination [that confirmation is not likely to be followed by liquidation or further reorganization] must . . . be 'firmly rooted in predictions based on objective fact[s].' And those objective facts must show that it is more likely than not that a debtor will be able to make all payments required by the confirmed plan." *In re J.C. Householder Land Trust #1*, 501 B.R. 441, 448 (Bankr. M.D. Fla. 2013) (finding that 85% occupancy for a shopping center is feasible where the center is currently leased at 88%) (quoting *In re Invest. Co. of the Sw., Inc.,* 341 B.R. 398, 311 (B.A.P. 10th Cir. 2006)[6]).

MidCap argues that *In re Brandywine Townhouses Inc.,* 524 B.R. 889, 891 (Bankr. N.D. Ga. 2014) (Ellis-Monro, J.), compels denial of confirmation on feasibility grounds. *Brandywine Townhouses* is distinguishable from the present case. In that case, the debtor would have needed to renovate 29 units at an additional monthly cost of $7,669 where the debtor had experienced negative operating income for eight months. Even after the renovations it was "questionable whether the units would generate income sufficient" to support the plan payments, since the proposed rent would still leave the debtor more than $2,000 per month short of the proposed loan payment. *Id.* at 893.

Assisted Living's budget contemplates, and unrefuted testimony confirms, that its monthly net income is approximately $40,000[7] and is unlikely to decrease. This is a far cry from the *Brandywine Townhouses* debtor and its negative income. Assisted Living does not contemplate significant increases in its expenses until the construction of the Memory Care

---

[6] MidCap cites this case in its objection. [Doc. 135 at 5].

[7] The monthly operating reports support this income level. From March through August of 2019, Debtor's average net income, calculated as receipts minus disbursements, was $38,395.89. March 2019: $63,219.80 [19-40262, Doc. 87]. April 2019: $-6,789.71. [19-40262, Doc. 104]. May 2019: $54,330.61. [19-40262, Doc. 148]. June 2019: $63,842.91. [19-40262, Doc. 149]. July 2019: $44,478.57. [19-40262, Doc. 150]. August 2019: $11,293.21. [19-40262, Doc. 153].

Facility restarts. The budget reflects a slight increase in income during months 7-11 of the plan to approximately $51,000 and then a large increase in month 13 when the Memory Care Facility is projected to open, such that Debtors' combined monthly net income will climb to $75,000.

The budget contemplates 82% occupancy at the Assisted Living Facility for months 7-11 of the Plans. The budget contemplates 64% occupancy across both facilities in months 13-18 as residents are moved from the Assisted Living Facility to the Memory Care Facility. The budget contemplates 72% occupancy across both facilities in months 19-24, increasing to 80% in months 25-30. In months 31-36, the budget contemplates 82% occupancy across both facilities, and if the exit strategy is implemented at the latest date provided for in the Plan, 84% occupancy is contemplated.

MidCap argues that the proposed occupancy rate of 90% is higher than the highest occupancy rate Assisted Living has ever held, at 85%. Ms. Pearson, who has worked as a consultant to Debtor since Mr. Glover purchased his interest and has assisted with oversight, review and budgeting, testified at the Hearing that, as of September 16, 2019, Assisted Living's occupancy rate was 80.9%. In the event occupancy can be increased, MidCap argues this may only be done by rent discounts that cut into Assisted Living's profit. Ms. Pearson testified at the MFR Hearing that rent concessions that have been made were used mostly to offset the uncertainty surrounding bankruptcy, a possible foreclosure, and the state of the unfinished Memory Care Facility, and that no such concessions need be made once the Plan is confirmed and the Memory Care Facility is operational. Ms. Pearson further testified that Assisted Living has a waiting list for would-be residents in its most popular room style, the studio. She explained that once the residents in the memory care wing are moved to the new Memory Care Facility, 20 new studio rooms will become available and that these rooms are likely to be filled immediately

from the waiting list. Although Debtors hope for 90% occupancy and MidCap argues that 90% is a percentage that Debtors have never achieved, the projections do not incorporate this level of occupancy and the 90% occupancy level is not necessary to the feasibility of the Plan.

The demand projections are supported by MidCap's expert William Childs who testified at the MFR Hearing that demand for memory care facilities is increasing, and that Atlanta is a strong market for senior housing. The testimony of Anthony Williams, Debtor's marketing expert, was also supportive of this analysis. Mr. Williams testified that demand for senior living continues to grow, and that although occupancies have stabilized throughout the country, the southeast is still underserved and that Georgia is underserved by approximately 1,400 units. The Court concludes that Debtor, who has raised the census at the Assisted Living Facility from 61 to 71 residents in eight months while navigating the unique challenges of bankruptcy, will likely raise the census by another 10 residents in a longer period post-confirmation and that a newly opened Memory Care Facility will also assist Debtor in reaching this goal by freeing up highly desirable studio rooms.

MidCap's expert, Gregory Hays, testified that Debtor's budget showed an increase in net operating income from approximately $300,000 to $1.1 million in three years, and that this reflected a 570% increase in income. Mr. Hays stated that he did not believe such an increase could be feasible. There is no doubt this is a dramatic improvement in income, however, the budget increases in census, income and expenses are all reasonable and as stated above likely to occur. In addition, the Court finds Ms. Pearson's experience and proven track record of realistic projections to be persuasive and does not find Mr. Hays' testimony sufficient to refute Ms. Pearson's testimony about projected increases in income at Assisted Living. As a result, the

Court finds that the revenue and occupancy projections are supportive of Debtor's probability of success in the proposed reorganization.

### c.    The budget is specific enough even though the projections show increases in occupancy in six-month increments.

In preparing the budget, Ms. Pearson used the average of historical data to project the budget forward in six month stretches. Where she had actual knowledge of increasing expenses she included the actual expenses, and otherwise, she looked at historical data to project changes. She projected increases in the census in the months leading up to the Hearing that were borne out by Debtor's operating reports and there is no evidence that the reliability of her predictions has somehow decreased. In the budget attached to the Disclosure Statement, Ms. Pearson predicted an increase from 65 to 70 residents in six months. [*See* Doc. 75.] The resident census actually increased from February 5, 2019 to September 11, 2019, a period of around seven months, from 61 to 71 residents. *See infra* at 16.

Mr. Hays testified that Ms. Pearson's budget, which provides for increases in occupancy every six months, was misleading because occupancy does not increase in six-month periods. In his analysis, Mr. Hays smoothed the occupancy increases because each time a unit is added, expenses and income increase, and the converse when a unit is vacated. Certainly, residents would not enter and exit the Facilities in six-month blocks, with the likely exception of the initial opening of the Memory Care Facility. Notwithstanding, the Court finds that Ms. Pearson's projections were "firmly rooted in predictions based on objective fact" based upon Ms. Pearson's proven track record of reasonable projections, her substantial experience in budgeting for Debtor and her very credible testimony.  *In re Diplomat Constr., Inc.,* 2009 WL 6498180 at *2.

14

### d. Debtor has accounted for increasing costs.

Failure to account for increased costs can be a consideration for feasibility. *See, e.g., Brandywine Townhouses*, 524 B.R. at 893 (noting that the debtor had failed to account for increased utility costs for renovated units). There are no federal minimum staffing ratios for personal care facilities or memory care facilities, but the state of Georgia has set staffing ratios for personal care facilities.[8] The regulations require one employee for every 15 residents during waking hours and one employee for every 25 residents during the night. Staff such as cooks and maintenance staff who do not deliver personal care directly to the residents are not to be counted for the purpose of calculating this ratio, and at least one administrator or manager must be available 24 hours a day. Ga. Dep't Comm. Health R. 111-8-62-.10, available at www.dch.georgia.gov; *see also* Ga. Dep't Comm. Health R. 111-8-63-.09 (assisted living communities of 25 or more residents have the same staffing ratios).

Dr. Lovell confirmed that Debtor's staffing is typically above the minimum required by the state at one employee per every 6.5 residents in the memory care unit. Ms. Pearson testified at the Hearing that Assisted Living's staffing levels in the memory care unit are contingent on its occupancy at a rate of five residents to one certified nursing assistant ("CNA") or medical technician. MidCap points out that 11 employees were terminated in May 2019 and have not been replaced and argues that the Plan does not provide for the necessary increase in staffing for the projected increase in occupancy when the Memory Care Facility becomes operational. The evidence on census and staffing has been distilled into the chart below.

---

[8] There are no state-mandated staffing ratios for memory care facilities. [Proffer of testimony of Dr. David Lovell at the Ombudsman Hearing].

| Date | Residents | Full-time staff | Part-time staff |
|---|---|---|---|
| February 5, 2019 | 61 | | |
| March 1, 2019 | | 57 | 12 |
| March 31, 2019 | | 59 | 14 |
| April 30, 2019 | | 59 | 14 |
| May 13, 2019 | 64 | | |
| May 31, 2019 | | 49 | 13 |
| June 28, 2019 | 69 | | |
| June 30, 2019 | | 55 | 0 |
| July 31, 2019 | | 56 | 0 |
| September 11, 2019 | 70 | | |
| September 16, 2019 | 71 | | |

Ms. Pearson testified that the Assisted Living has streamlined its staff, moving away from overtime pay, staffing agencies and temporary or part-time workers to full-time employees with regular non-overtime hours. Although the relationship between staffing levels and the resident census is not entirely clear, Assisted Living has maintained staffing above state regulations, and the testimony of Dr. Lovell and Ms. Pearson that there have been no resident complaints indicates that staffing is sufficient. It is reasonable to infer Debtors will continue to make staffing plans that meet the residents' needs.

Ms. Pearson testified that another salesperson[9], one or two cooks[10], a concierge[11] and two or three servers[12] and at least one housekeeper[13] would be added when the Memory Care

---

[9] The salary of a salesperson is approximately $50-60,000 per year (about $4,583 per month).

Facility opens, and that two new CNAs[14] would be needed once the Memory Care Facility's occupancy rises to more than 20 residents. Ms. Pearson testified that it would be unnecessary to add administrative staff as the current supervisor of the Debtor or the current assistant general manager would move to the new facility and the current wellness director and sales staff would serve both facilities, with the addition of one salesperson in the sixth month of the Plan. The testimony showed that about $18,783 in additional payroll will be needed upon Memory Care having at least 20 residents. The budget reflects a $20,000 monthly increase upon completion of the Memory Care Facility to $140,000, from the current actual payroll of about $120,000 per month.[15] The Court finds that Debtor has adequately budgeted for the increased staffing needs.

To the extent increased costs other than staffing were discussed, the testimony of Thomas Tropea at the Hearing and that of Debtors' real estate consultant at the MFR Hearing was that these costs could be minimized through increased buying power and economies of scale. William Childs, Mid Cap's appraiser, did not consider economies of scale in his analysis. Nevertheless, the Court concludes that Debtors have sufficiently accounted for increasing costs in the budget.

### e.    Debtor will have the same managers as Assisted Living.

"[M]anagerial efficiency, and whether the same management will continue to operate the company" is a factor to consider in evaluating feasibility. *In re Thurmon*, 87 B.R. at

---

[10] The salary of a cook is approximately $30,000 per year each ($2,500 per month), for a total of $5,000 per month.

[11] No evidence was presented about the nature of this role or the salary a concierge would be paid.

[12] Servers are paid approximately $1,500 per month each for a total of $4,500 per month.

[13] Housekeepers are paid approximately $1,500 per month.

[14] CNAs or medical technicians are paid approximately $1,600 per month each for a total of $3,200 per month.

[15] The July monthly operating report supported Ms. Pearson's testimony of approximately $120,000 per month payroll expenditures. [Doc. 150].

191. The testimony at the MFR Hearing showed that the Assisted Living Facility was about a year behind schedule when Glover joined Assisted Living, and that within a few months of Glover becoming a member, the Assisted Living Facility was licensed and accepting residents. It is unclear why construction stopped at the Memory Care Facility, but the evidence showed that Fouse was the architect responsible for signing off on applications to MidCap for payment of construction draws. The Court finds that any issues with MidCap and Fouse are unlikely to persist as Fouse is no longer involved with day-to-day operations at either Debtor and the Plan contemplates a third-party investor, not MidCap, providing the remaining construction funding. In addition, Canopy will remain responsible for day-to-day operations at the Assisted Living Facility and at the Memory Care Facility when it opens.

Under Glover, Pearson, and Canopy, Debtors have continually worked toward improving the efficiency of their management. For example, in June of 2018, Assisted Living replaced its general manager with a licensed practical nurse who was employed by it in a different capacity. Assisted Living, under Canopy, Glover and Pearson, has steadily increased its census and completed physical improvements to the Assisted Living Facility while apparently continuing to provide high-quality care to its residents. In all the Debtors appear to be in the hands of capable managers and to the extent there were managerial inefficiencies prior to filing, these issues are no longer present.

2.    Proposed in Good Faith - § 1129(a)(3)

Section 1129(a)(3) requires that the plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). The good faith requirement merely requires "that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *McCormick v. Banc One Leasing Corp. (In re*

*McCormick),* 49 F.3d 1524, 1526 (11th Cir. 1995). "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirements of section 1129(a)(3) are satisfied." *Id.* In assessing whether the plan was proposed in good faith, the Court considers the plan itself as well as the totality of circumstances surrounding the plan. *Kaiser Aerospace & Elec. Corp. v. Teledyne Indus. (In re Piper Aircraft Corp.),* 244 F.3d 1290, 1300 (11th Cir. 2001).

MidCap argues that "Debtor's Plan is a scheme for delay and to frustrate MidCap's right to foreclosure, which is [necessarily] not proposed in good faith" [Doc. 135 at 14], and cites to *Travelers Insurance Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.),* 779 F.2d 1456, 1460 (10th Cir. 1985). The Court disagrees. As further discussed with negative amortization issues below, the Plan preserves MidCap's right to foreclose in the event of plan failure.

As to *Pikes Peak Water Co*., it supports confirmation.

> Not confirming the plan for lack of good faith is appropriate particularly when there is no realistic possibility of an effective reorganization and its evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights. However, such is not the case here. . . . [T]here is substantial growth and development in the area of the Debtor's property and . . . there is a concomitant increase in demand for [Debtor's business].

*Id.* at 1460. There is substantial growth and development both on the ground at the Facilities and in the southeast market for senior living facilities as a whole. Considering the totality of the circumstances surrounding a feasible plan and a field with substantial growth, the Court finds that the Plan has been proposed in good faith.

3.     Best Interests of Creditors - § 1129(a)(7)

Section 1129(a)(7), known as the "best interest of creditors" test, requires that each holder of a claim in an impaired class has either accepted the plan or will receive at least as

much as it would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7). Section 1129(a)(7)(A)(ii) only requires that "a dissenting creditor [receive] at least as much value as the dissenting creditor would receive under a Chapter 7 liquidation." *See Mercury Capital Corp. v. Milford Conn. Assoc., LP*, 354 B.R. 1, 8 (D. Conn. 2006) (quoting *United States v. Reorganized C&I Fabricators, Inc*., 518 U.S. 231, 228 (1996)); *see also In re J.C. Householder Land Trust #1,* 501 B.R. 441, 456 (Bankr. M.D. Fl. 2013).

MidCap argues that the Plan violates § 1129(a)(7) because Debtor failed to conduct a true liquidation analysis. MidCap argues that the liquidation analysis provided does not consider closing costs or United States Trustee fees on a sale, nor does it discuss the risk to MidCap of waiting an additional 36 months to have the Loan paid. Debtor argues that it expects to exit bankruptcy prior to incurring United States Trustee fees beyond those generally due quarterly because payments under because the Plan will be substantially consummated prior to the exit strategy.  With respect to the risk associated with a balloon payment, the Court has found that the evidence supports the feasibility of the Plan and the Debtor's exit strategy such that the proposed balloon payment does not place undue risk on MidCap.

The testimony of William Childs as to the liquidation value of the Debtor was that such value is $3 million as of the MFR Hearing. Mr. Childs testified that upon completion of the Memory Care Facility the value would increase to $7.1 million and upon stabilization the value would be $10.3 million. If Debtor was liquidated in a chapter 7 case, the value would be less than $7.1 million and closer to $3 million at which level only MidCap would be paid as opposed to the Plan that proposes to pay all creditors in full over three years. Ms. Pearson's testimony was to this exact effect. The Court finds the best interest of creditors test has been met.

### B.    Confirmation Requirements of § 1129(b)

Section 1129(b) of the Code provides that if all requirements of § 1129(a) are met except for (a)(8), requiring impaired classes to vote to accept the plan, then the plan may still be confirmed if it meets the "cram down" requirements of § 1129(b). If at least one class of impaired creditors accepts the plan, then if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan, then the plan may still be confirmed. At issue here is the "fair and equitable" requirement, as the "discriminate unfairly" condition "has little, if any significance in the context of a secured claim." *In re Riddle,* 444 B.R. 681, 686 (Bankr. N.D. Ga. 2011) (Bonapfel, J.). Section 1129(b) provides, in relevant part, as follows:

 (1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
 (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
  (A) With respect to a class of secured claims, the plan provides—
   (i)
        (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
        (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the Effective Date of the plan, of at least the value of such holder's interest in the estate's interest in such property. . . .

"A Plan is fair and equitable with respect to a secured claim if, under the Plan, the holder of the secured claim retains the lien securing the claim and receives payments over the life of the plan totaling at least the allowed amount of the claim of a value as of the effective

date, of the value of the secured claim." *In re Diplomat Constr.*, No. 09-68613, 02009 WL 6498180 at \*14-15 (citing 11 U.S.C. § 1129(b)(2)(A)(I)). As with § 1129(a), the Debtor bears the burden of establishing that the plan is fair and equitable. *See id.* at \*15 (citing *Imperial Bank v. Tri-Growth Centre City, Ltd.*, 136 B.R. 848, 851 (Bankr. S.D. Cal. 1992)). The requirements of § 1129(b) are in the alternative such that a plan need only satisfy one alternative, but "the Court may decide that a plan is not fair and equitable and is therefore unconfirmable even if it is in technical compliance with these requirements." *In re IPC Atlanta Ltd P'ship,* 142 B.R. 547, 554-55 (Bankr. N.D. Ga. 1992) (Drake, J.).

MidCap argues that the negative amortization plan and interest rate proposed is not fair and equitable; it believes it is entitled to a default interest rate under *In re Scarborough*, No. 91-41032-COL, 1992 WL 672983, \*3-4 (Bankr. M.D. Ga. Dec. 31, 1992) and that 7.5% is insufficient. It also argues that the payments made over the life of the Plan do not provide a 7.5% return on its claim.

1.    The Interest Rate Is Fair and Equitable, Considering the Market Rate and Risk of Default.

The prime rate is 4.75% as of the time this Order was written. Debtor has proposed an interest rate of prime plus 2.75%, which is squarely within the "generally approved adjustments of 1% to 3%". *Till v. SCS Credit Corp.*, 541 U.S. 465, 480, 124 S.Ct. 1951, 1962 (2004). No evidence has been presented as to the appropriate risk factor over prime that should be applied in this case. As the creditor bears the evidentiary burden as to the appropriate risk factor over the generally approved adjustments, *id.* at 484-85, and no evidence was presented on this issue, the Court finds MidCap has not carried its burden of supporting a prime-plus adjustment outside of the generally approved parameters. The Court, in its sound judgment, finds

that 2.75% is a sufficient risk factor considering that MidCap appears to be oversecured and its collateral is generally performing well and projected to appreciate..

      2.    <u>Negative Amortization Is Not *Per Se* Inequitable.</u>

The Plan proposes negative amortization in that Debtor calculates interest owed MidCap on the principal amount owed, but provides for payment of only a portion of the interest accrual until the balloon payment is made. "The extent of negative amortization depends upon the difference between the 'accrual rate' or the overall rate of interest to be paid on a claim, and the 'pay rate' or the rate of interest to be paid on a monthly basis." *Great Western Bank v. Sierra Wood Group*, 953 F.2d 1174, 1176 (9th Cir. 1992) (quoting *In re Club Assoc.*, 107 B.R. 385, 398 (Bankr. N.D. Ga. 1989)). Here, the pay rate is 1.40%, 3.47%, and 6.22% such that the negative amortization in year one is 6.35%, in year two 4.03%, and 1.28% in year three.

"Although negative amortization is not *per se* inequitable, [it] is highly suspect when evaluating a plan's compliance with the cram-down requirements." *In re Club Assocs.*, 107 B.R. at 398. Courts faced with negative amortization plans use the following factors to determine whether the use of negative amortization is fair and equitable in a particular case:

    1. Does the plan offer a market rate of interest and present value of the deferred payments;
    2. Is the amount and length of the proposed deferral reasonable;
    3. Is the ratio of debt to value satisfactory throughout the plan;
    4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;
    5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;
    6. Are the risks unduly shifted to the creditor;
    7. Are the risks borne by one secured creditor or class of secured creditors;
    8. Does the plan preclude the secured creditor's foreclosure;
    9. Did the original loan terms provide for negative amortization; and
    10. Are there adequate safeguards to protect the secured creditor against plan failure.

*In re Oaks Ptrs., Ltd.*, 141 B.R. 453, 456 (Bankr. N.D. Ga. 1992), *subsequently aff'd,* 956 F.2d

1065 (11th Cir. 1992) (citations omitted); *see In re Club Assocs.*, 107 B.R. at 398-99 (applying

some but not all of the *Oaks* factors).

           The Court has concluded that the 7.5% rate is a sufficient rate of interest to

provide MidCap with a market rate of interest plus compensation for the additional risk

associated with this case. The next issue the Court must consider is if Debtor is paying MidCap

the present value of its secured claim. Debtor's exhibit 43 provides that Debtor will pay MidCap

$22,022,658 at the end of the 36-month term. The present value of that amount, using the 7.5%

interest provided in the Plan, is $17,760,208.[16] This amount is sufficient to pay the present value

of the principal owed MidCap, but is not sufficient to pay the amount of MidCap's claim which

includes interest and fees.

           Debtor argues that the term note, [MidCap's exh. 6], does not provide for

payment of interest on interest and that under Georgia law, unless such provisions are express in

the contract between the parties, interest cannot be capitalized. MidCap argues that Debtor

neglects to consider the provisions in the Credit Agreement that provide for collection of interest

on interest.  In so arguing MidCap points to Section 2.2 of the Credit Agreement. That section

provides: "[f]rom and following the Closing Date, except as expressly set forth in this

Agreement, the Loan and the other Obligations shall bear interest …". *Id.* at 20.  "Obligations"

is defined as "all obligations, liabilities and indebtedness (monetary (including post-petition

interest, whether or not allowed) or otherwise of each Credit Party under this Agreement or any

other Financing Document, in each case howsoever created arising or evidenced…." [MidCap's

exh. 20, p. 11].  MidCap argues that because interest on Obligations, which includes interest, is

---

[16] The formula for determining present value is future amount divided by $(1 + \text{interest rate})^{\text{\# of discounted periods}}$ = present value. 7 COLLIER ON BANKRUPTCY ¶1129.05, 1129-143 n. 27 (16th ed.). Utilizing this formula results in the following: 22,022,578 divided by 1.24 = 17,760,208.

provided for in the Credit Agreement, the contract between the parties expressly provides for collection of interest on interest in accordance with Georgia law.

The term note, [MidCap's exh. 6], expressly incorporates the terms and conditions of the Credit Agreement. It states, "…reference is hereby made to the Credit Agreement for a statement of the terms and conditions under which the Loan evidenced hereby was made and is required to be repaid" and further states:

> [e]ach Borrower promises to pay interest from the date hereof until payment in full hereof on the unpaid principal balance of the Loan evidenced hereby at the per annum rate or rates set forth in the Credit Agreement. Interest on the unpaid principal balance of the Loan evidenced hereby shall be payable on the dates and in the manner set forth in the Credit Agreement. Interest as aforesaid shall be calculated in accordance with the terms of the Credit Agreement.

The definition of Obligations in the Credit Agreement expressly includes post-petition interest and the Credit Agreement expressly contemplates payment of interest on Obligations in section 2.2. Thus, the Credit Agreement expressly contemplates payment of interest on interest and because the Credit Agreement controls the terms of repayment under the note, MidCap is entitled to interest on the full amount of its claim. Because of this, the Plan as proposed does not satisfy the fair and equitable requirement as it does not pay MidCap the present value of $19,271,908.39.

Debtor need only satisfy one subsection of § 1129(b)(2)(A). However, it does not appear to the Court that the Plan contemplates treatment in accordance with subsection (ii) or (iii) because there is no provision in the Plan sale procedures under § 363(k) and Debtors did not argue that MidCap would realize the indubitable equivalent of its claim. Thus, the Plan is not confirmable as it is currently proposed because the proposed payment does not provide MidCap with the present value of its claim. The Court will, however, address each of the other negative amortization factors to facilitate possible amendment to the Plan.

With respect to the amount and the length of deferral, the term is within the range of time that has been allowed by other courts. *See Resolution Trust Corp. v. Wood (In re Wood)*, No. 90-0042, 1991 WL 332637, *6-7 (W.D. Va. Nov. 11, 1991) (four years); *In re Good*, 413 B.R. 552, 561 (Bankr. E.D. Tex 2009), *aff'd sub nom Good v. RMK Investments, Inc.*, 428 B.R 249, 256 (E.D. Tex. 2010) (three years). In addition, the Credit Agreement contemplates a four-year term with the option to extend the termination date for an additional year. Debtor proposes to extend the term for 36 months. The amount of interest deferral proposed in the Plan is $1,622,658 or 42.8% of all interest to accrue[17] over the three-year period. The amount of interest deferral is significant, but when considered in conjunction with the debt to value ratio and MidCap's equity cushion, the Court finds that the amount is not so high as to impose undue risk on MidCap.

As of the MFR Hearing, MidCap had an equity cushion of $1,128,092. This amount of equity will be consumed by interest accrual in month 14. Debtor projects that the Memory Care Facility will be complete by month 13. The Court has already found that Debtor's projections are reasonable and support feasibility. Mr. Childs valued the Memory Care Facility upon completion at $7.1 million for an increase in value of $2.5 million. Thus, the interest accrual does not erode MidCap's equity cushion. In addition, as of the Hearing the debt to value ratio was 1:1.05. In month 13 of the Plan the ratio would decrease to 1:1, but in month 14 it increases to 1:1.12. With respect to the slight dip in the debt to value ratio in month 13, MidCap's Assisted Living collateral is appreciating and likely is worth an amount slightly north of the $15.8 million established by Mr. Child's appraisal given the improvements to the Assisted Living Facility, the increased census and the reduced payroll. In addition, Debtors did some work to secure the Memory Care Facility and protect the partially completed facility after Mr.

---

[17] These calculations are based on Debtor's calculations in the Plan as currently proposed.

Child's review of the facility for his appraisal such that the Court finds that its value increased to some degree. Here, the proposed deferral is offset by the increase in value by completion of the Memory Care Facility and the improvements to the Assisted Living Facility and operations so that there would be no erosion of MidCap's equity cushion.

The next issue the Court must consider is whether unacceptable risk is imposed on MidCap through the Plan or if there are adequate safeguards to MidCap's interest should the Debtor be unable to perform as provided in the Plan. The Plan precludes MidCap from foreclosing so long as Debtor is performing in accordance with the Plan and the Credit Agreement (except those provisions altered or eliminated by the Plan)[18]. In the event Debtor defaults in making Plan payments or otherwise under the Plan, [Doc. 76 at 6], MidCap retains its security interest and its remedies under the Credit Agreement. The Plan provides for exercise of remedies after providing notice and an opportunity to cure.

To the extent the Plan fails, the risk--to the extent there is risk given MidCap's equity cushion--falls on MidCap as all other creditors will only be paid if the Plan is successful. If the Plan fails, only MidCap will be paid through its collateral while other creditors will not be paid. Notwithstanding, the Court finds the Plan does not increase MidCap's risk to an unacceptable level because, as has been previously shown, MidCap's equity cushion increases over time with completion of the Memory Care Facility and stabilization of both Facilities.

Considering all the facts and circumstances in this case and the proposed treatment of MidCap's claim, the Court finds that, but for the failure to pay MidCap the present value of its claim, Debtor has proposed a Plan that is fair and equitable to MidCap. In conclusion, the Court finds that Debtor has met its burden of demonstrating that the Plan meets

---

[18] The Plan provides, among other items, that any pre-Effective Date default under the Credit Agreement and insolvency or financial condition or ratios shall not constitute a default under the Plan. [Doc. 42 at 16].

all elements of 11 U.S.C. § 1129(a) except subsection (a)(8), but has failed to demonstrate that

the Plan is fair and equitable as required by § 1129(b). Accordingly, it is hereby

ORDERED that confirmation of the Plan is DENIED; it is further

ORDERED that Debtor may amend the Plan on or before **January 30, 2020** to

address the current Plan's failure to satisfy 11 U.S.C. § 1129(b). It is further

ORDERED that, should Debtor fail to amend the Plan, the Court will schedule a

status conference to discuss appropriate next steps.

**END OF ORDER**

## Distribution List

Leon S. Jones
Jones & Walden, LLC
21 Eighth Street, NE
Atlanta, GA 30309

Leslie M. Pineyro
Jones and Walden, LLC
21 Eighth Street, NE
Atlanta, GA 30309

Lindsay P. S. Kolba
Office of the U.S. Trustee
Suite 362
75 Ted Turner Drive, S.W.
Atlanta, GA 30303

Martin P. Ochs
Office of the U. S. Trustee
362 Richard Russell Federal Bldg.
75 Ted Turner Drive, SW
Atlanta, GA 30303

United States Trustee
362 Richard Russell Federal Building
75 Ted Turner Drive, SW
Atlanta, GA 30303

Evan M. Altman
Evan M. Altman, Attorney at Law
Building 2
8325 Dunwoody Place
Atlanta, GA 30350-3307

Francesca Macchiaverna, Esq.
Hunter, Maclean, Exley & Dunn, P.C.
P.O. Box 9848
Savannah, GA 31412

Aspen Village At Lost Mountain Memory Care, LLC
2860 Overlook Court
Atlanta, GA 30324

ALL CREDITORS AND PARTIES